UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| HOWARD GURULE,<br><br>              Plaintiff,<br><br>    v.<br><br>CORRECTIONAL MEDICAL<br>SERVICES, DR. GARRETT, FERMIN<br>VILLARREAL, ASST. WARDEN<br>PRADO, SUSAN BOJOVICH, ROBIN<br>WIEDL, DARYL YANDELL,<br><br>              Defendants. | Case No. 1:08-CV-244-BLW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Pending before the Court is a Motion for Summary Judgment filed by Defendants

Fermin Villarreal, Assistant Warden Prado, Susan Bojovich, Robin Wiedl, and Daryl

Yandell. (Dkt. 25.) The Motion is now fully briefed. Having reviewed the record, the

Court finds that the decisional process would not be significantly aided by oral argument.

Therefore, in the interest of avoiding further delay, the Court shall decide this matter on

the written motions, briefs, and record without oral argument. D. Idaho L. Civ. R. 7.1(d).

Accordingly, the Court enters the following Order.

**INTRODUCTION AND SUMMARY OF PLAINTIFF'S CLAIMS**

Howard Gurule (Plaintiff) is an inmate in custody of the Idaho Department of

Correction (IDOC). From February 1, 2007, through March 11, 2008, he was housed at

the Idaho Correctional Center (ICC), a facility operated by Corrections Corporation of America, Inc. (CCA), a private corporation that contracts with the IDOC to provide a prison facility for Idaho inmates. The allegations in Plaintiff's Complaint (Dkt. 3) relate only to the time periods he was housed at ICC. Plaintiff brings his Eighth Amendment claims under 42 U.S.C. § 1983 against several employees or contractors of ICC.

In the Initial Review Order (Dkt. 5), the Court found that Plaintiff had alleged sufficient facts to proceed against individual ICC Defendants Villarreal, Prado, Bojovich, Wiedl, and Yandell on claims that (1) Plaintiff was not provided with adequate follow up treatment or physical therapy after a hospitalization and several surgeries for Septicemia, and (2) he was denied wrist surgery after an outside physician recommended the surgery. These Defendants have been served and have filed an Answer.

Plaintiff was also permitted to proceed against Dr. Garrett. Plaintiff was notified that he was required to provide a service of process address for Dr. Garrett. (Dkt. 15.) Because Plaintiff did not provide a current service address, his claims against Dr. Garrett will be dismissed without prejudice.

In the Initial Review Order, the Court informed Plaintiff that he did not allege sufficient facts to state a § 1983 policy or custom-based claim against Correctional Medical Services (CMS), the private entity that provides inmate medical care at the prisons. Therefore, Plaintiff was not allowed to proceed against this Defendant, and all such claims will be dismissed with prejudice.

**LEGAL STANDARDS**

## 1. Standard of Law for Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims. . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *See id.* at 248. The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). In addition, the Court must be "guided by the substantive evidentiary standards that apply to

the case." *Liberty Lobby*, 477 U.S. at 255.

The moving party bears the initial burden of demonstrating the absence of a

genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)

(en banc). To carry this burden, the moving party need not introduce any affirmative

evidence (such as affidavits or deposition excerpts) but may simply point out the absence

of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato

Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to

support a jury verdict in his favor. *Id*. at 256-57. The non-moving party must go beyond

the pleadings and show by "affidavits, or by the depositions, answers to interrogatories, or

admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

## 2. Standard of Law for Civil Rights Claims

To state a claim under § 1983, a plaintiff must allege a violation of rights protected

by the Constitution or created by federal statute proximately caused by conduct of a

person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir.

1991). To prevail on an Eighth Amendment claim regarding prison medical care, Plaintiff

must show that prison officials' "acts or omissions [were] sufficiently harmful to

evidence deliberate indifference to serious medical needs." *Hudson v. McMillian*, 503

U.S. 1, 8 (1992) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). The Supreme

Court has opined that "[b]ecause society does not expect that prisoners will have

unqualified access to health care, deliberate indifference to medical needs amounts to an

**MEMORANDUM DECISION AND ORDER- 4**

Eighth Amendment violation only if those needs are 'serious.'" *Id*.

The Ninth Circuit has defined a "serious medical need" in the following ways: failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain; . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992), *overruled on other grounds*, *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).

Deliberate indifference exists when an official knows of and disregards a serious medical condition or when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and actually draws such an inference. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *See Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Lab*, 622 F.2d 458, 460 (9th Cir. 1980). A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes serious harm. *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990). If the defendants are able to show that medical personnel have been

"consistently responsive to [the inmate's] medical needs," and there has been no showing

that the medical personnel had "subjective knowledge and conscious disregard of a

substantial risk of serious injury," a plaintiff's claims may be dismissed by summary

judgment prior to trial. *Toguchi v. Chung*, 391 F.3d 1051, 1061 (9th Cir. 2004).

The Eighth Amendment does not provide a right to a specific treatment. *See*

*Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to

demand specific care. She is not entitled to the best care possible. She is entitled to

reasonable measures to meet a substantial risk of serious harm to her."). A prison doctor's

recommendation for a less costly treatment is not deliberate indifference unless the

recommendation "was so inadequate that it demonstrated an absence of professional

judgment, that is, that no minimally competent professional would have so responded

under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir.

1998).

In *Toguchi v. Chung*, the Ninth Circuit underscored the difference between

medical malpractice, which is not actionable under the United States Constitution, and

deliberate indifference, which is an Eighth Amendment violation. Particularly, a plaintiff

must show that the medical providers subjectively had knowledge of a serious risk to the

plaintiff, and chose to disregard that risk. In *Toguchi*, Dr. Chung treated Inmate Toguchi

several times before his untimely death in prison. The final time she treated him, she

prescribed a course of medication that expert witnesses for the plaintiffs (Toguchi's

surviving parents) opined caused a toxic level of drugs in his bloodstream, causing his

MEMORANDUM DECISION AND ORDER- 6

death.

The Ninth Circuit, however, rejected the plaintiffs' expert witness opinions that the treating physician, Dr. Chung, had been deliberately indifferent. To reach this result, the Court focused particularly on what Dr. Chung *knew* and *believed* before her allegedly wrongful acts or omissions. In response to an argument that Dr. Chung should have considered the prescription drug Cogentin an excessive risk to the deceased inmate's health, the Court opined: "Because she did not *believe* that Cogentin use presented a serious risk of harm to Keane, her conduct cannot constitute deliberate indifference." *Id*. at 1058 (emphasis added). Similarly, the Court noted,

> *It does not matter whether Dr. Chung's assumptions and conclusions were reasonable*. Rather, *so long as she was not subjectively aware of the risk* that Keane could be suffering from a drug overdose, and disregarded that risk, she was not deliberately indifferent. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

*Id*. at 1060 (emphasis added). Summary judgment for Dr. Chung was thus appropriate.

## DISCUSSION

### 1. Undisputed Material Facts

The following undisputed facts are found in Plaintiff's ICC medical records (Docket No. 25-3) and Plaintiff's Complaint. Facts that are immaterial are not included. If disputed facts are essential to determining a claim, then Plaintiff's version of those facts has been used.

While incarcerated at ICC, Plaintiff was admitted to St. Luke's Regional Medical Center on May 9, 2007, for pain in his back, liver, and kidney areas. He was diagnosed as having cramps and told to take Ibuprofen and rest. (Complaint, p. 3, Dkt. 3.) On May 19, 2007, he was taken to the hospital for progressively worsening related symptoms. He was diagnosed with a serious blood infection called Septicemia; he also had "acute renal failure, anemia, and hyponatremia."[1] (Medical Records, Dkt. 25-3, p. 11.) As a result of the infection, he underwent surgeries for a septic right knee, right posterior hand abscess, and an epidural abscess. Plaintiff remained hospitalized at St. Luke's Regional Medical Center for three weeks in order to receive necessary surgeries and antibiotics to treat his condition. (*Id.*)

On June 11, 2007, Plaintiff was discharged in good condition from St. Luke's Medical Center and released into the custody of ICC with follow up instructions for ICC medical staff under the supervision of Dr. Garrett. Discharge instructions included: (1)

---

[1] Plaintiff also had pre-existing conditions of Hepatitis and a wrist deformity from a 10-year-old fracture that may have been exacerbated by the Septicemia. (See Dkt. 25-3, pp. 8 & 11.)

eight weeks of outpatient IV antibiotics; (2) weekly lab tests for infection; (3) various

medications; (4) regular diet as tolerated; (5) physical therapy and occupational therapy as

tolerated; (6) removal of staples in knee on 06/18/07; (7) surgery follow up with Dr.

Heggland's office in two weeks; and (8) follow up with Dr. Watkins to examine wrist

within one week.

Upon returning to ICC on June 11, 2007, Plaintiff was placed in the medical unit

for five weeks until he was transferred back to the general prison population on July 16,

2007. During the time Plaintiff was housed in the medical unit, his medical records

indicate that he was treated every day. Plaintiff's medical records also indicate that he was

encouraged by attending physicians and nurses to exercise, breathe deeply, and walk in

his cell to promote recovery. Plaintiff did not receive formal physical or occupational

therapy during this time.

On June 29, 2007, Plaintiff was transported to Dr. Heggland's office where he was

evaluated for any signs of post-surgical infection. Plaintiff's medical records indicate that

Dr. Heggland noticed some stiffness at surgical sites but commented that this was normal.

Dr. Heggland recommended that Plaintiff continue to work on range of motion (ROM)

and progressive resistance exercises (PRE's).

On July 16, 2007, Plaintiff was transported to the office of Dr. Watkins for an

evaluation of his wrist and hand. Plaintiff's medical records from this office visit indicate

a positive diagnosis of "carpel tunnel syndrome in his right wrist, instability of the radial

collateral ligament of the right thumb MCP joint, and severe arthritis of the right wrist."

**MEMORANDUM DECISION AND ORDER- 9**

(Stoll Aff. 9, Dkt. 25-3.) In his notes, Dr. Watkins indicated that he spoke with Plaintiff about a surgical procedure that could restore his range of motion and decrease hand numbness. Dr. Watkins further documented that before he could fully determine whether surgery would be beneficial, Plaintiff would need to undergo electrical studies. Dr. Watkins asked to revisit Plaintiff after electrical studies had been performed.

On September 16, 2007, Plaintiff was treated at ICC by Dr. Garrett for medical needs related to Septicemia and his right wrist. Dr. Garrett ordered a neurology consult for Plaintiff's right wrist.

On October 10, 2007, Plaintiff was transported to Boise Neurological Consultants for an appointment with Dr. Richard Wilson regarding the pain and numbness in his wrist and hand. Medical records from this visit indicate that Dr. Wilson made a similar diagnosis as was made in July by Dr. Watkins. Dr. Watkins states, "E[lectrical] studies in the right arm would be appropriate to assess the magnitude of [Plaintiff's] . . . neuropathy at the wrist in hopes of determining whether he would be a reasonable candidate for any form of surgical decompression." (Stoll Aff. 12, Dkt. 25-3.) Dr. Watkins recommended electrical studies and provided information on how these studies could be scheduled.

On December 4, 2007, Plaintiff was transported to Boise Neurological Studies for electrical studies on his right arm. Dr. Wilson's examination of Plaintiff's report indicates: "There is a very severe right median neuropathy at the wrist with denervation." (Stoll Aff. 13, Dkt. 25-3.)

On March 11, 2008, Plaintiff was transferred from ICC to SICI. Defendants had

**MEMORANDUM DECISION AND ORDER- 10**

nothing further to do with Plaintiff's medical care after that date. On July 3, 2008,

Plaintiff was transported to the office of Dr. Watkins for a surgical consultation

appointment for his wrist pain and hand numbness. Dr. Watkins indicated that he would

like to see Plaintiff for another office visit in one week for further discussion of the

complexities of the surgical decision-making process.

**2. Claims against Defendants Wiedl, Yandell, and Bojovich**

Defendants Robin Wiedl and Daryl Yandell were employed during the relevant

time by ICC as registered nurses and clinical supervisors. Defendant Susan Bojovich was

employed during the relevant time by ICC as a health services administrator. Plaintiff

generally asserts that Defendants Wiedl, Yandell, and Bojovich were "responsible for the

health care need of any and all inmates confined within the IDOC." (Complaint, Dkt. 3,

pp. 9-10.) Plaintiff alleges that Defendants Wiedl, Yandell, and Bojovich (1) failed to

provide adequate follow up treatment and physical therapy after his surgeries, and (2)

denied him the surgery on his wrist that had been ordered by an outside physician.

**A.** *Denial of Physical Therapy*

The hospital discharge summary indicated that Plaintiff should have physical

therapy. Plaintiff alleges that Defendants' failure to provide formal physical therapy

violated his right to be free from cruel and unusual punishment.

Defendants argue that Plaintiff has not shown that they were deliberately

indifferent to a serious medical need. Defendants argue that while they did not provide

*formal* physical therapy, they show that medical personnel aided Plaintiff in exercise,

ambulation, and deep breathing exercises. Defendants point to 24 separate medical notations in Plaintiff's medical records indicating when Plaintiff was engaged in informal physical therapy-type activity between June 14, 2007, and July 15, 2007. (Defendants' Statement of Facts, ¶ 6, Dkt. 25-2.)

A medical record of June 29, 2007, from Dr. Erik H. Heggland, indicated that Plaintiff's right knee and left great toe were healing well. Dr. Heggland did not order formal physical therapy. Rather, Dr. Heggland recommended that Plaintiff continue to work on ROM/PRE's (range of motion/progressive resistance exercise). Medical records from Plaintiff's other outside physicians do not show that formal physical therapy was ordered for Plaintiff for his hand or wrist after he returned from the hospital.

Plaintiff sent a medical request form asking about physical therapy on November 9, 2007. Defendant Wiedel responded, instructing him to request a medical appointment with the doctor. (Dkt. 3, p. 29.) A medical note from a visit with Dr. Garrett on November 29, 2007, shows that Plaintiff asked if he would be sent out for physical therapy. He reported that the cold weather increased his pain, and so he stopped exercising. Dr. Garrett advised Plaintiff that he needed to continue exercising. (Dkt. 25-3, p. 34.)

Based upon the evidence in the record, the Court finds and concludes that Plaintiff has failed to show that formal physical therapy was required or that any injury or damage was actually caused by the failure to provide formal physical therapy. Because Plaintiff was being constantly monitored by a physician, there is nothing in the record indicating that Defendants Bojovich, Wiedel and Yandell–who are lower-level medical

personnel–should have taken steps to provide Plaintiff with formal physical therapy when it was not deemed necessary by his treating physicians. While the discharge record indicated that physical therapy should have been provided, it does not specify that it must be provided formally, rather than informally.

Defendant Dr. Garrett told Plaintiff to continue his informal exercises. Similarly, Dr. Heggland's instructions indicate that Plaintiff "continue" what he had been doing in the prison for range of motion and progressive resistance exercises. Plaintiff has brought forward no medical opinion that shows that the advice to continue to exercise rather than to prescribe formal physical therapy is outside of the range of reasonable advice provided by similar medical health professionals. Finally, Plaintiff has failed to bring forward any evidence showing that Defendants acted with deliberate indifference by providing informal rather than formal physical therapy to Plaintiff. For these reasons, Defendants are entitled to summary judgment on this claim.

**B.** *Appropriate Post-Hospitalization Care*

Prison medical records show that Plaintiff was provided with daily medical care after he returned from the hospital. Plaintiff received three weeks of IV antibiotic treatment at the prison. In June and July 2007, Plaintiff had a series of follow up visits with his specialists. Those physicians noted that he was making satisfactory progress in his healing.

Prison medical records show on September 16, 2007, Dr. Garrett indicated that Plaintiff would be referred for additional follow up diagnostic visits for his wrist because

his Septicemia had stabilized. (Dkt. 25-3, p. 33.) Plaintiff was also treated by Dr. Garrett on October 10, 2007, October 21, 2007, November 1, 2007, and November 29, 2007. (Dkt. 25-3.) On October 10, 2007, Plaintiff saw a neurological specialist for numbness in his hand. On December 4, 2007, Plaintiff had an EMG.

There was a three-month gap between Plaintiff's EMG in December 2007 and Plaintiff's transfer from ICC in March 2008. When Plaintiff asked about the status of the wrist surgery decision, Defendant Wiedl responded to Plaintiff's grievance, stating: "No final decision has been made by the doctor who just received the results of the Electromyography report." (response dated February 24, 2008) (Dkt. 3, p. 24.) Plaintiff provides no evidence (1) directly linking any of the Defendants to the gap in treatment, (2) showing the gap was due to Defendants' actions; or (3) showing that the gap caused him serious harm.

Defendants had no further responsibility for Plaintiff's treatment after March 11, 2008. Seven months after he was transferred into the custody of IDOC, Plaintiff received a follow up consultation with Dr. Watkins on July 3, 2008.

Though the testing and consultation appointments took approximately one year, and three months followed the EMG testing, there is no indication in the record that the length of time was due to *deliberate indifference* of *these* lower-level medical Defendants, rather than the difficulties of Plaintiff's diagnosis, coordinating out-of-prison medical visits, and awaiting the opinion of the doctor. Nothing in the record indicates that Plaintiff's wrist condition was an emergency. Plaintiff's appointments were consistently

**MEMORANDUM DECISION AND ORDER- 14**

aimed toward providing Plaintiff and his doctors with the information needed to determine whether surgery was indicated.

Importantly, diagnosis of Plaintiff's problem was complex and difficult, especially given that Plaintiff had a pre-existing wrist deformity from a prior injury, and it was unclear during the time period at issue that wrist surgery was advised or would be successful. On July 16, 2007, Dr. Watkins wrote: "I ran out of time today and talked with him about the complexities of the decision making process concerning his wrist so I will see him back in a week for further discussion." (Dkt. 25-3 p. 17.) On the same date, Dr. Watkins wrote a letter, indicating: "I am not sure he that can undergo a scaphoidectomy and a four-corner fusion and have a satisfactory result since I do think the radiolunate joint is somewhat involved. Thus, that may mean that he needs a pan wrist fusion but in a wrist that has 105 degrees that is a fairly dramatic change." (Dkt. 25-3, p. 10.) On October 10, 2007, Dr. Wilson recommended: "EMG studies in the right arm would be appropriate to assess the magnitude of his suspected right median neuropathy at the wrist in hopes of determining whether he would be a reasonable candidate for any form of surgical decompression." (Dkt. 25-3, p. 12.)

The timeline of Plaintiff's care is appropriate and similar to what people might experience outside of prison. "[D]elay in providing a prisoner with [medical] treatment, standing alone, does not constitute an [E]ighth [A]mendment violation." *Hunt v. Dental Department*, 865 F. 2d 198, 200 (9th Cir. 1989). Based on all of the foregoing, the Court finds and concludes that the post-hospitalization care provided to Plaintiff was regular

and appropriate, and that no evidence of deliberate indifference of Defendants is evident from the record. Defendants are thus entitled to summary judgment on the claim that Plaintiff was not provided with constitutionally adequate post-hospitalization care.

### C. *Contracting Septicemia*

Rather than setting forth an argument showing how Defendants were deliberately indifferent after Plaintiff returned from the hospital, Plaintiff argues that Defendants were at fault for his contracting Septicemia in the first place.

Plaintiff argues:

> Plaintiff contracted a life-threatening blood infection known as Septicemia, while in the custody of ICC under the care of the Defendants. Based on the emergency medical procedures required to preserve Plaintiff's life; this court can easily infer from the medical evidence that, Septicemia when properly addressed would not have required several surgical procedures to save the Plaintiff's life. Thus resulting in the Plaintiff's permanent disfigurement with physical limitations.

(Response, p. 3, Dkt. 27.)

However, Plaintiff has failed to show any causal link between any Defendant's action and the fact that Plaintiff contracted Septicemia. Prison staff took Plaintiff to the hospital on May 9, where the on-staff physician diagnosed him with cramps, and prescribed Ibuprofen and rest for him. Plaintiff has provided no evidence showing that these particular Defendants immediately should have acted differently rather than relying on and following the hospital physician's diagnosis and plan for treatment and watching Plaintiff. Medical staff provided Plaintiff with a wheelchair and treatment upon his return from the first hospital visit. (Complaint, p. 4.) At a point when Plaintiff was becoming

MEMORANDUM DECISION AND ORDER- 16

progressively worse (10 days later,) prison staff again took Plaintiff to the hospital.

Plaintiff argues that Defendants have attempted to "minimize their negligence" and divert the Court's attention from the main cause of action–the near death experience from Septicemia. (Response, p. 3, Dkt. 27.) However, Plaintiff has failed to show that, if Defendants were at fault prior to the hospitalization, their fault was due to deliberate indifference rather than mere negligence. Negligence is not actionable under § 1983. *Daniels v. Williams*, 474 U.S. 327 (1986).

**4. Claims against Defendant Fermin Villarreal**

Defendant Fermin Villarreal was employed as the ICC Chief of Security during the time period at issue. Plaintiff has alleged that Villarreal is "responsible for the daily operations and implementation of Policies and Directives that govern the Idaho Correctional Center and is responsible for the actions and or inactions of himself and any and all contracted employees contracted thereto along with the staff of the Idaho Correctional Center." (Complaint, Dkt. 3, p. 9.) Plaintiff alleges that Villarreal violated his Eighth Amendment right by failing to treat Plaintiff's serious medical condition.

In order to state a valid claim against Defendant Villarreal, Plaintiff must show that Fermin Villarreal had direct participation in the denial of Plaintiff's medical care. This, Plaintiff has not shown. Plaintiff has not provided documentary or testimonial evidence to indicate that Defendant Villarreal knew of Plaintiff's complaints about inadequate health care or made any decisions related to Plaintiff's health care.

Even if Plaintiff was able to show that Defendant Villarreal was aware of

MEMORANDUM DECISION AND ORDER- 17

Plaintiff's desire for additional medical care, "liability under § 1983 must be based on active unconstitutional behavior and cannot be based upon a 'mere failure to act.'" *Shehee*, 199 F.3d at 300. Where a defendants' "only roles in [a civil rights] action involve the denial of administrative grievances or the failure to act . . . they cannot be liable under § 1983." *Id.* Moreover, Defendant Villarreal may not be held liable because of his position as Chief of Security because there is no respondeat superior liability under § 1983. *Taylor v. List*, 880 F.2d at 1045.

Plaintiff has not provided evidence specifying any particular acts or omissions of Defendant Fermin Villarreal related to Plaintiff's post-hospitalization medical care. Villarreal did respond to two grievance appeals, denying Plaintiff's request for damages from the misdiagnosis of Septicemia. (Dkt. 3, pp. 34-35 & 40.) Such a response many months after the alleged constitutional violation occurred does not causally link Villarreal to the alleged violation. As a result, these claims are subject to summary judgment.

### 5. Claims Against Defendant Assistant Warden Prado

Plaintiff generally alleges that Assistant Warden Prado "is responsible for the daily operations and implementation of Policies and Directives that govern the Idaho Correctional Center and is responsible for the actions and or inactions of himself and any and all contracted companies and employees contracted thereto along with the Idaho Correctional Center and its staff." (Dkt. 3, p. 10.) Plaintiff's Eighth Amendment medical deliberate indifference claims against Defendant Prado are subject to the same analysis as set forth directly above in the discussion about Defendant Villarreal. Prado similarly

responded to a grievance appeal well after the alleged "misdiagnosis" violation occurred, and he approved the medical staff's response that current medical treatment was appropriate because the outside physician was still reviewing the tests to see if surgery was indicated. (Dkt. pp. 24-25.) Because Plaintiff has provided no facts showing Prado's personal participation in the past violation or showing deliberate indifference in the current treatment for the wrist problem, Defendant Prado is entitled to summary judgment.

## SUMMARY AND CONCLUSION

Plaintiff has failed to adequately refute with evidence Defendants' position that the medical records establish that Defendants provided constitutionally adequate medical care. As a result, all of the individual defendants are entitled to summary judgment. Plaintiff's failure to serve Dr. Garrett will result in dismissal of the claims against him without prejudice; in any event, the record currently before the Court does not establish that Dr. Garrett was deliberately indifferent to Plaintiff's serious medical needs. Plaintiff's claims of negligence prior to his hospitalization are not actionable in a § 1983 action. Plaintiff's claims against CMS are subject to dismissal for failure to state a policy-based claim against that entity.

## ORDER

**IT IS ORDERED:**

    1.    The Summary Judgment Motion of Defendants Robin Wiedel, Daryl Yandell, Susan Bojovich, Fermin Villarreal, and Assistant Warden Prado

(Dkt. 25) is GRANTED.

2.     Claims against Correctional Medical Services (CMS) are DISMISSED with

prejudice for failure to state a claim upon which relief can be granted.

3.     Claims against Dr. Garrett are DISMISSED without prejudice for failure to

effect proper service of process.

4.     Plaintiff's entire case (including the Complaint, Dkt. 3) is DISMISSED.

DATED:  **August 9, 2010**

Honorable B. Lynn Winmill
Chief U. S. District Judge